735 So.2d 790 (1999)
STATE of Louisiana
v.
Michael NICHOLAS.
No. 97-KA-1991.
Court of Appeal of Louisiana, Fourth Circuit.
April 28, 1999.
*791 Harry F. Connick, District Attorney of Orleans Parish, Charles E.F. Heuer, Assistant District Attorney of Orleans Parish, New Orleans, LA, Counsel for Plaintiff, State of Louisiana.
Pamela S. Moran, Louisiana Appellate Project, New Orleans, LA, Counsel for Defendant, Michael Nicholas.
Court composed of Judge MIRIAM G. WALTZER, Judge PATRICIA RIVET MURRAY and Judge DENNIS R. BAGNERIS Sr.
WALTZER, Judge.

STATEMENT OF THE CASE
Defendant was charged on 15 July 1996 by bills of information with three counts of theft of motor vehicles valued in excess of $1000. On 17 July 1996 he appeared in court with appointed counsel Ross Scaccia, waived the reading of the bills and entered pleas of not guilty. At that time he was advised of his constitutional rights. On 24 July 1996 he was present in court with appointed counsel Kerry Cuccia, received a copy of the police report and withdrew his motion for a preliminary hearing and all discovery motions. At the first trial setting, 1 August 1996, defendant requested a competency hearing. The trial judge appointed Drs. Ritter and Salcedo to examine defendant as to his present competency and set the hearing for 8 August 1996. Defendant was present and represented by *792 Mr. Scaccia at the competency hearing. Upon the testimony of Dr. Ritter and stipulated concurrence of Dr. Salcedo, the court found defendant competent to proceed and to assist his attorney. Following trial on the merits, a six-person jury found defendant guilty of theft of property having a value of $500 or more on Count 1; guilty of unauthorized use of movables having a value of more than $1000 on Count 2; and guilty of theft of property having a value of $500 or more on Count 3. Defendant was cited for contempt of court three times during the trial, and filed a motion for arrest of judgment and/or for new trial.
On 13 December 1996 the State filed a multiple bill charging defendant as a fourth offender. The motion for new trial was set for hearing on 17 January 1997, when the court excused witness Jane Johnson and took testimony of Tyrone Green. The motion was continued for hearing on 28 February 1997. At that hearing, defendant represented himself. The State and defendant stipulated to the testimony of Bernard Charbonnet and of the witnesses listed on defendant's witness list. The trial court subpoenaed Spinato Chrysler's personnel records pertaining to defendant and reset the matter for a ruling on the motion for a new trial on 13 March 1997. On that date, the trial court denied defendant's motion for a new trial and ordered a pre-sentence investigation. On 13 May 1997 defendant appeared and, upon his own request, represented himself at the sentencing. The trial court imposed a sentence of ten years at hard labor with credit for time served on each of Counts 1 and 2, and a sentence of five years at hard labor with credit for time served on Count 3, sentences to run consecutively. The court waived court costs due to defendant's indigence. The State filed a multiple bill pursuant to La.R.S. 15:529.1 to which defendant pled not guilty.
At the multiple bill hearing on 23 May 1997 the defendant was present and represented by appointed counsel Joseph Meyer. The State offered fingerprint identification, a certified copy of the arrest registers and bills of information as to predicate offenses and the testimony of an accepted fingerprint expert. On the basis of the evidence, the trial court found defendant to be a fourth felony offender, vacated the original sentence as to count 1 and sentenced defendant on that count to serve the balance of his natural life at hard labor. The life sentence is to run consecutively to the sentences in counts 2 and 3. Court costs were waived. The trial court denied the defense motion to reconsider sentence.
The trial judge granted defense counsel's motion to appeal and appointed the Louisiana Appellate Project to represent defendant. We affirm the convictions on all counts and the sentence on count one; we vacate the sentences on counts 2 and three and remand for resentencing.

STATEMENT OF FACTS
Prior to jury voir dire, defendant complained that he had never spoken with his appointed counsel, Mr. Scaccia. Defendant told the court:
Your Honor, you appointed me an attorney. The attorney resigned off the case. Okay. You appointed Mr. Scaccia to me. Mr. Scaccia came into court on Friday, on last week. You knew why and I know why he could not proceed with the trial. I have never talked to Mr. Scaccia outside of five minutes in this court. I think it's unfair. I'm on trial for a serious thing. I would fare out better just defending myself than having somebody assist me. He knows nothing about my case. I asked Mr. Scaccia, "Would you please provide me with the police reports?" I have nothing. He has never come seen me. This is ridiculous. You call that fair? That's the way they doing inmates? Just becauseI think it's very racist.
The Court:
Racial?
*793 Defendant:
I think it's veryit wouldn't happen if I wasn't black.
The Court:
It wouldn't?
The defendant:
No, Judge. I'm being honest. It wouldn't happen if I wasn't black. I never seen this attorney one time. Who would go to trial with somebody they haven't seen one time?
The Court:
You know, I hear a lot of times
The defendant:
I hear a lot of times that you get angry with inmates and thenoh, yeahthey tell me you go completely in the nut zone.
The Court:
Nut zone?
The defendant:
I know this, okay? You go completely
The sheriff:
Order in the court.
The defendant:
I'm not being disrespectful.
The Court:
Mr. Nicholas, they're not talking to you.
The defendant:
Oh, okay. They tell me you go completely mad and wild at times. Well, I'm just talkingI'm not talking about my freedom. All I'm looking for, one thing out of your court: and that's a fair trial with a fair defense. Give me my chance to present my side to the jury. That's what you have denied me of.
The Court:
No. You're going to have that chance today. You are going to have that chance to present your side to that jury. Trust me, you will have that chance.
Mr. Scaccia:
Excuse me, your Honor. I just want to say for the record that this is his I'm his third lawyer. I have spoken to Mr. Whittaker about this case, and I spoke to Mr. Cuccia about this case. And I tried to talk to this defendant about his case, but he has this attitude that makes it very difficult. Now, I have read the report. I have seen everything in here. I understand what his story is, and I'm prepared to go to trial.
The defendant:
I would like to say one thing. You are saying I had three attorneys. I didn't have no three attorneys. That's number one. We're not going to argue that. Number two is I asked himare my witnesses here this morning, Mr. Scaccia?
The Court:
Mr. Nicholas, I'm going to note your objection.
The defendant:
Please that's all I want you to do.
The Court:
your objection to this being racial and me being in the nut zone.
The defendant:
No. No. No.
The Court:
We'll note those objections.
The defendant:
And my objection to going to trial this morning and no witnesses subpoenaed, yeah.
The Court:
That too.
The defendant:
You put that objection. In fact, look here. You can send me back to jail. Go ahead. You can go. You can send me back to jail, and y'all can have a trial by yourself.
The Court:
Bring the jury in, please.
The defendant:

*794 I know about Cannizzaro.
Mr. Scaccia:
If you would just sit right there
The defendant:
I know about him, Leon Cannizzaro. Asshole all the way.
The defendant contended that his witnesses had not been subpoenaed. According to the list provided in connection with his motion for a new trial, those witnesses included: Rosa Edwards, Bernard Charbonnet, Dr. Dwight McKenna, Dr. Eric Holt, Jane Johnson, Greg Ussin, Andrew Sanchez, Ricky Gillette, Angelo Spinato, Grayband Shields, Owner of Top Motel, Manager of Top Motel, Officer Maurice Sanders and Officer Gary Wells.

THE CARTER THEFT
Albert Carter, owner of one of the stolen cars, testified that he knew the defendant when he was a student in Mr. Carter's eighth grade class. The defendant came to Mr. Carter's home around Thanksgiving and sold him seafood for delivery during the Christmas holidays. Mr. Carter's 1987 Peugeot automobile displayed a "For Sale" sign, and he told the defendant he was trying to sell the car. Mr. Carter described the car as in perfect condition, with 70,000 miles on the odometer. He had purchased the car for $14,800, and it had a loan value at the time of the theft of $3,800. In February, the defendant offered to help sell the car at an auction; however, Mr. Carter removed the car from the auction. In March, the defendant again offered to help sell the car, and told Mr. Carter he would like to take the car to a prospective purchaser.
Mr. Carter obtained a note in which defendant said he was taking the car for a day or so to be sold. The asking price was $2400. The defendant backed the car out of Mr. Carter's driveway, and that was the last time Mr. Carter saw his car. Two days later, defendant called Mr. Carter "collect" and promised to take the car to him "in a minute." Mr. Carter discovered that defendant had placed the call from a convenience store on Chef Menteur Highway. Two days later, Mr. Carter reported the theft of his car to his insurer and to the police. The car was never returned. Officer Guy Wells of the New Orleans Police Department, Seventh District, testified that on 23 March 1996 he took a stolen car report telephoned in from the defendant. The defendant told him he was trying to sell a car belonging to Alfred Carter when the car was stolen from the parking lot of the Top Motel on Chef Menteur Highway. According to the defendant's report to the police officer, the car keys were on the nightstand in defendant's motel room. On 24 March 1996, Mr. Carter notified Officer Wells that the defendant had not returned the car to him. Officer Wells subsequently arrested the defendant.

THE SANCHEZ THEFT
Madelyn Cosey Sanchez testified that on 24 March 1996 defendant came to her home to detail a 1993 Isuzu Rodeo owned by Ms. Sanchez and her husband, Andrew. The parties stipulated the car had a value of over $1,000. The defendant told Ms. Sanchez he would detail the car at his parents' nearby home and would return the car in about 45 minutes. The defendant never returned her car. Ultimately, the police department recovered the car.
Andrew Sanchez testified similarly to his wife. Approximately two weeks after the theft, he saw the car in front of Flynn's Den Lounge on Chef Menteur Highway and contacted the police. The police located the car the next day and returned it to Mr. Sanchez.
Mario Gould testified that on 5 May 1996 he was arrested for possession of the Sanchez's Isuzu Rodeo. According to Mr. Gould, he obtained the car from the defendant a couple of weeks prior to the arrest. Defendant told Mr. Gould that Mr. Sanchez had been unable to make his payments on the car and had transferred it to the defendant, who took over the payments. *795 Mr. Gould did not know that the car had been stolen. Mr. Gould admitted that he had been convicted in 1991 of possession of cocaine with intent to distribute and of possession of marijuana.

THE SPINATO THEFT
Tyronne Green testified that he was employed as a salesman by Spinato Chrysler in May, 1996. On 22 May, the defendant came to Spinato and asked to test drive a 1989 Lincoln Town Car. Mr. Green asked for identification, whereupon defendant told him he knew Spinato's owners, dropped a few names, and assured Mr. Green there would be no problem were he to allow him a test drive. Mr. Green was still dubious, and told Joe and Angelo Spinato that a gentleman claimed to know them and wanted a test-drive. The Spinatos recognized the defendant's name. Mr. Green told Joe Spinato that he was not too sure about the defendant. Mr. Spinato spoke to the defendant, and the defendant returned to Mr. Green and asked if he was ready for the test drive. Although Mr. Spinato had not told him specifically to allow the defendant to test drive the car, Mr. Green assumed after having observed Mr. Spinato and the defendant in friendly conversation that he should proceed. Mr. Green drove the defendant towards New Orleans East. Defendant asked Mr. Green to take the Downman Road exit from Interstate Highway 10 in order to show the car to defendant's wife. They drove down Chef Menteur Highway, whereupon defendant asked Mr. Green to allow him to drive to his wife. Mr. Green got out of the car and stepped in front of the car on his way to the passenger side. The defendant took off in the car, leaving Mr. Green behind. That was the last time Mr. Green saw the car. He walked half a mile to a pay telephone, called the dealership and reported the incident. The police ultimately recovered the car and returned it to the dealership approximately two weeks after the theft. The parties stipulated that the Town Car's value exceeded $1,000.
Joe Spinato testified that he was general sales manager for Spinato Chrysler Plymouth, and knew Mr. Green as a Spinato employee. According to Mr. Spinato, the defendant had not worked at Spinato, although he had done work for one of the Spinato brothers.
Mr. Spinato testified that he spoke to the defendant at the Spinato used car lot, and told him not to give Mr. Green a hard time, that Mr. Green was just trying to do his job. Mr. Spinato denied having given Mr. Green permission to take the car off the lot or to deviate from the assigned test drive route, which is down Canal Street three or four blocks past Jefferson Davis Parkway and back to the dealership. He also testified that it was dealership policy to obtain a copy of a test driver's driver's license prior to a test drive. He corroborated Mr. Green's testimony concerning the aftermath of the theft. Mr. Spinato denied ever having purchased a car from or sold a car to the defendant prior to the theft. At no time did he give the defendant permission to take the Town Car off the dealership's lot.
The defense called Lawrence Nicholas, defendant's father, who testified that the defendant detailed cars, at times at his parents' home.
The defendant testified that he is self-employed and has a detail shop, working in New Orleans East and in New Orleans. He also has an ownership interest in Aunt Zannie's Restaurant. He testified that he worked at Spinato in 1984, and has known Angelo Spinato since 1975. According to the defendant, he and Clarence Duke sold cars in the past, but not recently, for Spinato on consignment at D & S Auto Sales on Claiborne Avenue and Orleans Avenue. He claimed to have told Joe Spinato that he might have a buyer for the Town Car. He and Mr. Green drove the car to SheShe's, a bar on Chef Menteur Highway, to meet a prospective buyer. The buyer was not there, and the defendant wanted to go to the buyer's house. According to the defendant, Mr. Green

*796 disagreedjust totally got on my last nerve. And I knew Joe well enough and Joe trust me enough with his car. I just went overwhen he got out the car, yes, I did drive off. I went back over to the guy's house with the car. I wasn't intentionally trying to take the car from Spinato or anything. I was going overthis is something I have done before. I did this with Joe. Joe know I have done this before.
The defendant testified that he was unable to be bonded because of prior convictions, including passing worthless checks, unauthorized use and theft, and for having failed to return a demo car while he was working for Bill Watson Ford.
Defendant testified that his driver's license had expired the previous November. He admitted that he did not have permission to keep the Lincoln Town Car for more than a half day or so.
Defendant claimed that after he detailed the Sanchez's Isuzu, he asked Mario Gould to drive it back to the Sanchez home, since the defendant had no valid driver's license.
As to the Carter car, defendant claims that it was stolen by a maintenance man working for the Top Motel. According to the defendant, the motel's owners told Officer Wells that the maintenance man had not been seen at the motel. The defendant denied having told Officer Wells that the keys to the car were on the nightstand in defendant's motel room. Instead, he contended that he gave the keys to the maintenance man when he came to the room and told defendant to move the car.
At the hearing on defendant's motion for new trial, the defendant struck Jane Johnson, Clarence Duke and Officer Armond from his witness list. The parties stipulated that Bernard Charbonnet would testify that defendant had cleaned Mr. Charbonnet's cars over the years without difficulties. The defendant gave the following summary of the testimony he would have elicited from the unsubpoenaed witnesses, to which the state stipulated:
Ms. [Rosa] Edwards would testify that she lives a couple of doors from Ms. Sanchez, that she recommended me to the Sanchezes to do the car, that I've done her car, her and her husband's cars over a five-year period, that they've never had any trouble, that she would consider my service to be reliable.
[Dr. Dwight McKenna would testify] thatover a three-year span, he would testify the same thing that Ms. Rosa Edwards would testify to.
Dr. [Eric] Holt would testify that he's a neighbor. He would testify that in his initialin our initial meeting that he relinquished the keys to his van, told me to take it, shampoo it, bring it back the next day. The next day, the van was brought back to him. The gentleman didn't even know where I lived. He didn't know if I lived in the neighborhood. He, again, would testify that he had had no problems with me, that I've done his cars over the years. In fact, he would testify thathow confident he was of me, he stopped me from working washing cars to work for him.
Greg Ussin of Banner Chevrolet. He's a used car manager at Banner Chevrolet. He would say that he saw Al Carter he seen Al Carter's car that I had, that I had Banner Chevrolet look at it. Also, Mr. Sanchez' testimony would be the same, the next one under.... Greg Ussin ... and Sanchez are two employees of Banner Chevrolet. No kin to the alleged victim.... Okay, sir. These two managers would testify that I did approach them. They were at two different locations. I approached them about buying supposedly Al Carter's car, the Peugeot. We did talk at the auction. They knew that from time to time, I'd come by with cars to sell to them, you know, and it wasn't any hanky-panky that went down with the deal. I did bring the car to them, asked both gentlemen one worked at Banner Discount Lot, the other one worked at Banner *797 Used Car Lotwhat number would they give me on the car. Those numbers that they gave me, I was in turn to give to Mr. Carter and tell him, okay, this is the figures I got for you for your Peugeot.... No problems in the past. [Ricky Gillette would testify] that Mr. Spinato lied [when he denied that defendant had worked for Spinato in May, 1984]. Officer Gillette, if he was here today, would look over this police report, a normal police report done by officers of the New Orleans Police Department. On Page two of this police report, it would show thaton page two of this police report, it will clearly show that at the time this officer stopped Mario Gould in the alleged victim's car, that Mr. Gould gave his address as the victim's address. It's clearly on the police report. It wasn't a mistake that was made. He tried to misrepresent and say that he lived at that address, that he resided with him.... Again, Officer Gillette would testify if he was here, in reviewing this other police report by for the Spinato Chrysler case, it clearly states thatin the police report, it clearly states that Mr. Green states in the police report that he gave the investigating officers my driver's license number. Officer Gillette will testifyand my driver's license. Officer Gillette, if he was here, would testify that I don't own a driver's license.
I want to call [Mr. Spinato] back to proveI want him to bring the payroll records from Spinato Chrysler to prove that that's the only way they could have got a copy of my driver's license because I do not own a driver's license.... He said that I did not work at Spinato, that his brother had worked with me at some other dealership, which was false, Your Honor. The jury had a right to entertain this and determine who was telling the truth about it, whether it was a truthful statement he made. He made a false statement in front of the jury.... I want to ask him why he lied ... [and said] I never worked at Spinato Chrysler.
The Court:
You have other evidence that you're presenting to try to rebut or refute what
Mr. Spinato said, right?
The defendant:
Yeah.
The Court:
So you already have his testimony at the trial locked in and you have this other evidence which shows he might not have been telling the truth. Can we rely on that then to show he's lying in your opinion?
The defendant:
Yes.
The defendant also made a statement concerning information he would elicit from the owners of Top Motel.
Me go and check into the Top MotelI notice the owner's not here from the Top Motel. They have moved off Chef Highway, do you understand? ... They would tell that I was in their hotel and their employee took my car and decided tothe guy decided he's gonna go to the store in the car and get out the car and leave it running.
The defendant said he did not know the identity of the Top Motel's owner, and told the trial court:
All I know is the people who allegedly are the manager, owner, whatever, when I came out and asked him to call the police, that my car had been missing, that their employee took my carnot my car, Mr. Carter's carand went to the store in it and the car was taken from him at the store. The employee neverthe employee never came back. After he told me the car was stolen, he left the hotel again. He never did return. And I stayedthree or four days I passed, trying to get the police to go. He never returned to work at the Top Motel. If they were here to testify today, they would say that I checked into the hotel and that one of their employees a handyman or whatever you call himcame and asked me to move my car. I let him use the keys to move the car and he decided to take upon his own, *798 without permission, to go to the store in the car, to go get him cigarettes or whatever he went to the store for.... And alleged that someone stole the car. Further, they would testify that I did call the police from there, the police car came out and came and told me to contact Officer Wells.... And that they did, in fact, talk with Officer Wells on the phone, explaining thatthe situation, why they didn't wantwhywhatever. I don't know. They had a long conversation on the phone.... They're Iranian people. I have no idea what their name would be.
Grayband Shields, if he was here, would testify that he's a relative of mine. We were in the restaurant business together on Downman and Chef and he would testify that Carter's car sit in front of our restaurant for two days and that I was driving my other car, that it sit in front of the restaurant to two days with a "For Sale" sign on it and that every intentions were being made to sell Mr. Carter's car. There was no underhand dealings being made with Mr. Carter's vehicle.
Maurice Sanders is the officer who would come to court andthey told me he would be here for trial, he wasn't. The officer would testify that Mr. Tyronne Green of Spinato Chrysler identified me through driver's license. Your Honor, I do not own a driver's license, never had a driver's license in so long until it's not funny. I bought two cars last year, both Mercedes, and if the owner of the company would come, he would tell them I could not and did not own a driver's license. How would Mr. Green give this office my identification number and my driver's license is beyond us, your Honor. We need this officer here to testify. You said Tyronne Green could not answer for this officer. He was supposed to be here this morning.
Officer Guy Wells would testify that I did call him from the Top Motel on the 22ndI may be a little off onthe 22nd or the early 23rdto report that an employee of the hotel had unauthorized use of Mr. Carter's car and I was having problems with getting it back. I did not authorize him to go to the store. Officer Wells would further testify that he wascontacted the owner. Sir, I did not know Mr. Carter's license plate number, I did not know Mr. Carter's VIN number. I didn't have any of that information. Officer Wells did not contact Mr. Carter.
The trial court accepted a printout under the item number of Officer Wells's police report to substitute for Officer Wells's testimony.

REVIEW FOR ERRORS PATENT
Our review of the record reveals an error patent with respect to defendant's sentences on counts 2 and 3. According to the minute entry, the trial court imposed a sentence of ten years at hard labor on count 2 and a sentence of five years on count 3. Count 2, the unauthorized use conviction, carries a maximum sentence of five years or $5,000 fine. The sentencing transcript reflects that the trial court referred to the second theft count as count 2, and the unauthorized use count as count 3, while it appears that the charges were, in fact, in reverse order. We vacate the sentences on counts 2 and 3 and remand for resentencing to clarify which sentence is designated for each of the two counts.
There are no other errors patent.
FIRST ASSIGNMENT OF ERROR: The trial court erroneously denied defendant's motion for new trial and erroneously refused to ensure that witnesses requested to be present at trial were duly subpoenaed.
FIRST AND FIFTH SUPPLEMENTAL PRO SE ASSIGNMENTS OF ERROR: The trial court erroneously refused to grant a recess as defendant requested to honor compulsory process and to produce 16 defense witnesses whose names and addresses were provided to the court two weeks prior to trial.
The right of a defendant to compulsory process is the right to demand *799 subpoenas for witnesses and the right to have those subpoenas served. State v. Latin, 412 So.2d 1357, 1361 (La.1982). This right is embodied in both the federal and state constitutions and in this state's statutory law. Id.; United States Constitution, Amendment 6; La. Const. Art. I, sec. 16 (1974); La.C.Cr.P. art. 731.
However, this right does not exist in a vacuum, and a defendant's inability to obtain service of requested subpoenas will not be grounds for reversal of his conviction or new trial in each and every case. In order for defendant to show prejudicial error, he must demonstrate the testimony the witness might give which would be favorable to the defense and which would indicate the possibility of a different result if the witness were to testify. State v. Green, 448 So.2d 782 (La. App. 2 Cir.1984).
This Court found such prejudicial error to have occurred where all evidence presented to the jury boiled down to a head-to-head confrontation between defendant and a police officer. State v. Hill, 534 So.2d 1296, 1298 (La.App. 4 Cir.1988), writ denied, 536 So.2d 1248 (La.1989). There, the Court found that had the unsubpoenaed witness testified in support of defendant's case the result might have been different. Id. Prejudicial error arises where the absent witness is "vital" to the defense. State v. Peterson, 619 So.2d 786, 790 (La.App. 4 Cir.1993). Defendant failed to make such a showing on this record.
In the instant case, defendant orally requested a continuance in order that the witnesses he sought might be subpoenaed. This Court addressed a similar contention in State v. Borne, 96-1130 p. 7-8 (La.App. 4 Cir. 3/19/97), 691 So.2d 1281, 1284-85, writ denied, 97-1021 (La.10/3/97), 701 So.2d 197, certiorari denied, ___ U.S. ___, 118 S.Ct. 1196, 140 L.Ed.2d 325 (1998). La.C.Cr.P. art. 707 requires that defendant file a written motion for continuance at least seven days prior to trial, specifically alleging the grounds on which it is based and verified by the affidavit of the defendant or his counsel. Upon written motion and after a contradictory hearing, the court may grant a continuance, but only on a showing that such motion is in the interest of justice. Where the motion for continuance is based upon the absence of a witness, La.C.Cr.P. art. 709 requires a statement of the facts to which the absent witness is expected to testify, showing the materiality of the testimony and necessity of the witness's presence; facts and circumstances showing a probability that the witness will be available at the time to which the trial is deferred; and facts showing due diligence used in an effort to procure attendance of the witness. The granting or denying of the motion to continue lies within the trial court's discretion. La.C.Cr.P. art. 712. Denial of the motion is grounds for reversal only where defendant shows both abuse of the trial court's discretion and specific prejudice. State v. Borne, supra at p. 7, 691 So.2d at 1284. In Borne, defendant's oral motion to continue was based on his allegation that the clerk of court had failed to process his request to subpoena twenty-five witnesses. Other fact witnesses and the police officers testified at the trial. This Court found defendant had not met his burden under La.C.Cr.P. art. 709:
While the defendant stated the substance of some of the witnesses' testimony, he could not provide the court with such information for all the witnesses he alleged were unavailable. Further, the defendant did not show that there was a probability that the witnesses would be available at the time to which the trial would have been deferred. The defendant also failed to show that due diligence was used in an effort to procure attendance of the witnesses. The defendant did not contact some of the witnesses prior to trial to insure their availability. The trial court did not abuse its discretion when it denied the defendant's motion to continue. State v. Borne, supra at p. 8, 691 So.2d at 1285.
The same reasoning applies to the instant case. We have reviewed the stipulated *800 testimony as stated by the defendant himself and do not find that its presence amid the trial evidence would have created reasonable doubt of defendant's guilt in the mind of any reasonable juror.
Defendant admitted that the testimony of Jane Johnson, Clarence Duke and Officer Armond was not necessary to his defense. All that Ms. Edwards, Dr. McKenna and Dr. Holt could contribute was testimony that defendant had detailed their cars without having stolen them. This is not probative of whether he stole the three cars at issue in the case. Mr. Spinato, Mr. Sanchez and Officer Wells testified at trial and were cross-examined by the defense. The defendant was unable to identify or locate for subpoena the "owner and manager" of the Top Motel. There is nothing in defendant's summary of what he hoped would be the testimony of Messrs. Ussin, Gillette, Shields or Sanders to refute the basic gravamen of the bills of information, that defendant retained possession of the three cars without authority of their owners and converted them to his own use. The mere fact that he may have tried to sell one or more of the cars does not show that he had authority to do so or that the true owners would have benefited from the potential sale or sales.
Based on our review of the record, we find no abuse of the trial court's discretion in denying defendant's motion for a continuance and motion for new trial based on the unavailability of witnesses. These related pro se assignments of error are without merit.
SECOND ASSIGNMENT OF ERROR: There was insufficient evidence to support defendant's conviction for the theft of Albert Carter's automobile.
SECOND SUPPLEMENTAL PRO SE ASSIGNMENT OF ERROR: The state failed to present sufficient evidence of the value of the property and of defendant's criminal intent. All counts lack sufficient evidence.
In reviewing the sufficiency of the evidence to support a conviction, an appellate court is governed by the standard enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under this standard, the appellate court must determine whether the direct and circumstantial evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all the elements of the crime had been proven beyond a reasonable doubt. State v. Harris, 97-0778 (La.3/4/98), 708 So.2d 387, 388.
The elements of the crime of theft of a movable having a value of $500 or more are set forth in La.R.S. 14:67(A) and (B)(1):
1. misappropriation or taking of anything of value
2. which belongs to another;
3. either without the consent of the other or by means of fraudulent conduct, practices or representations;
4. with intent to deprive the other permanently of whatever may be the subject of the taking;
5. an object valued at $500 or more.
The elements of the crime of unauthorized use of a movable having a value over $1,000 are set out in La.R.S. 14:68(A):
1. intentional taking or use
2. of a movable that belongs to another
3. either without the other's consent or by means of fraudulent conduct, practices, or representations
4. without any intention to deprive the other of the movable permanently;
5. an object valued at $1,000 or more.
Our review of the record reflects adequate evidence of each element of the three offenses of which defendant was found guilty. The defense's only specific complaint as to sufficiency of evidence relates to the valuation of the Carter car. Mr. Carter testified without contradiction *801 that the Peugeot was about eight years old at the time of the theft. He had purchased it new for $14,800 and had driven it for 70,000 miles. He testified that the NADA blue book value of the car would have supported a bank loan of $3800, according to his banker. Clearly, he established a value in excess of $500. These assignments of error are without merit. THIRD ASSIGNMENT OF ERROR AND SIXTH SUPPLEMENTAL PRO SE ASSIGNMENT OF ERROR: Defendant's life sentence is unconstitutionally excessive.
Punishment is unconstitutionally excessive if it makes no measurable contribution to acceptable goals of punishment and is nothing more than the purposeless and needless imposition of pain and suffering, or is grossly out of proportion to the severity of the crime. The sentencing court has great discretion, and a maximum sentence is reserved for the most egregious and blameworthy of offenders. The criteria under La.C.Cr.P. art. 894.1 are to be considered when determining if a sentence within statutory limits is excessive. State v. Merrill, 94-0716 p. 5 (La.App. 4 Cir. 1/31/95), 650 So.2d 793, 797, writ denied, 95-0530 (La.6/23/95), 656 So.2d 1012.
The trial court specifically articulated the reasons for having given defendant a maximum sentence on the first count:
The Court in this casethis defendant was found guilty of three felony charges, two counts of theft of an automobile, one count of unauthorized use of an automobile. The Court ordered a pre-sentence investigation into Mr. Nicholas' background. I learned from the pre-sentence investigation the following: I'm going to quote. "This is a 45 year old man who has been arrested some 27 times, convicted of at least nine felony charges." The convictions and arrests start in 1969. His adult record starts in 1969. Arrests for obscene phone calls, a conviction and an arrest for avoid paying telephone bills, arrest for simple burglary, arrest for impersonating a police officer[interruption by defendant] My turn, my turn. Conviction for forgery to which he received probation, arrestanother conviction for theft for which he received jail sentence, another arrest and a bond forfeiture for failure to pay a hotel bill, another conviction for theft, another conviction for theft, conviction for possession of stolen property, conviction for theft, an arrest for an aggravated rape reduced to a forcible rape [interruption by defendant] arrest, arrest [interruption by defendant] another conviction[interruption by defendant] You have a right toyou have a right to [interruption by defendant]Mr. Nicholas, I let you talk. Let me talk, please. [interruption by defendant]. I'm trying to make the record here for the sentencing. That's all, sir. Another arrest for an aggravated rape, another conviction for a forgery, another arrest for an auto theft, another conviction for simple battery, a conviction for aggravated battery, a conviction for simple robbery, a conviction for forgery, a conviction for theft and possession of stolen property, a conviction for auto theft, a conviction forthen these cases and a subsequent conviction for issuing worthless checks also coming out of this court, and then these felony charges. The probation officer, in my opinion, summarizes this quite nicely. In reading this report, I am inclined to agree with the summary issued by the probation department. It says that "Mr. Nicholas has been arrested at least 27 times and has earned at least nine felony convictions. The subject claims he is not a bad person and should not be judged by his record, but his record speaks volumes about his lifestyle, character and world view. [interruption by defendant] He continues to *802 commit the same [interruption by defendant] he continues" [interruption by defendant] Now, let me tell you something. [interruption by defendant] Listen to me, please [interruption by defendant] Mr. Nicholas, please Mr. Nicholas [continuing interruptions by defendant]. "He continues to commit the same crimes repeatedly. One would think that at some point, he would learn and stop this behavior. However, he has not only failed to learn from his mistakes, his criminal activity has increased as he has aged. It is frightening to think just how much criminal activity he has committed that has gone unreported. While interviewing the subject, he blamed others for the criminal activity and rationalized his behavior. While listening to this man, it became clear that he has no remorse for the victims
The defendant:
None at all.
The Court:
"of his crimes." And he's just indicated he does not. [interruption by defendant] "He is a Twentieth Century pirate who has preyed upon society his entire life. [interruption by defendant] He has never contributed anything positive to our society." The probation office is annoyed that the subject was allowed to be on the streets and in the position to commit more criminal offenses; therefore, they feel that the subject should be sentenced to the maximum amount allowable by law and anything less would be a travesty. I should also note for the record that not only today but throughout this entire proceeding, Mr. Nicholas has as they have indicatedblames everyone, every single person. The clerks never got the reports, the sheriffs never sent subpoenas, this Court wasn't fair [interruption by defendant] all these things [interruption by defendant] all these things Mr. Nicholas has alleged, in the time that I've been sitting [interruption by defendant] on this bench, no one has ever alleged that any of these people have ever done anything but their job. [interruption by defendant] The record should also [interruption by defendant]the record[interruption by defendant] Mr. Nicholas, the record should also[interruption by defendant] Mr. Nicholas, please. Please don't make me gag you while I say this. I've got to put this on the record. I want the record to[interruption by defendant] I want the record to also reflect that throughout this entire sentencing proceeding, I am having to talk over the voice of this defendant, that this defendant refuses to stand quietly while he is sentenced, something that is very unusual. I never see this from anyone. Absolute disrespect for this Court, disdain for this entire system, and all of the [interruption by defendant] participants of this system. [interruption by defendant] It is therefore [interruption by defendant] one of the worst attitudes this Court has ever seen and I hope the Fourth Circuit Court of Appeal, in reviewing this case and in reviewing this sentence[interruption by defendant] will take into account [interruption by defendant] the attitude, the attitude of this defendant [interruption by defendant]which I know to be one of the worst attitudes I have ever seen of anyone who was ever brought into the criminal justice system. Absolute disdain and disrespect for this entire proceeding. And you would think that being in this system for the last 30 years of his life, he would have at least developed some respect for the system, because he was at least allowed to be back out on the streets for a record that should have put him away for a very long time a very long time ago.
*803 The trial judge then imposed two ten-year sentences and one five-year sentence on the three felony convictions, whereupon the defendant responded:
The Fourth Circuit. You better buy you a bunch of bulletproof vests for your family, you motherfucker. That's what you better do. Get bulletproof vests for your family, Judge. If I ever come home, I'm coming to see you.
After the hearing on the multiple bill, the trial court found defendant to be a fourth felony offender and vacated the ten year sentence as to Count One and imposed a life sentence at hard labor.
In light of the defendant's admitted total lack of remorse, extensive criminal record, recommendation of the probation office in its pre-sentence investigation report and defendant's threat of violence to the trial judge, his family, and this Court, we find the trial court did not abuse his discretion in sentencing defendant to life at hard labor. This assignment of error is without merit.
FOURTH ASSIGNMENT OF ERROR: The state failed to introduce sufficient evidence to support the trial court's adjudication of defendant as a fourth offender.
FOURTH SUPPLEMENTAL PRO SE ASSIGNMENT OF ERROR: This adjudication violated double jeopardy and constituted an abuse of the trial court's discretion.
At the multiple bill hearing on 23 May 1997, Officer Glen Burmaster testified as a fingerprint expert who worked in the New Orleans Police Department's Latent Fingerprint Unit for 23 years. He testified that he took defendant's fingerprints that day in court. He identified defendant's fingerprints as matching those on the arrest registers corresponding to defendant's convictions. He identified defendant's fingerprints on the following documents:
Exhibit 2: arrest register dated 2 January 1991; case # 347-988 C, violation of La.R.S. 14:67(A), theft over $500; guilty plea;
Exhibit 4: arrest register dated 13 June 1975; case # 250-816 A, violation of La.R.S. 14:69(A), illegal possession of stolen things; guilty plea;
Exhibit 6: arrest register dated 22 February 1984; case # 301-353 F, violation of La.R.S. 14:72, forgery; guiltyplea.[1]
The officer also identified certified copies of the bills of information relating to each of these crimes.
The record shows that from the expiration of defendant's sentence in 250-816 to his arrest in 301-853 only three years elapsed. The trial court's minute entry of 14 May 1976 shows revocation of defendant's parole and executory imposition of the five year sentence imposed in 250-816. The 22 February 1984 arrest register shows defendant's arrest in 301-853 only three years after expiration of the previous sentence. Furthermore, less than ten years elapsed from the date parole was revoked until the date of the second arrest.
La.R.S. 15:529.1(C) provides that this section shall not be applicable in cases where more than ten years have elapsed since the expiration of the maximum sentence or sentences of the previous conviction or convictions, and the time of the commission of the last felony for which he has been convicted. In computing the period of time as provided therein, any period of servitude by a person in a penal institution shall not be included in the computation of any of the ten-year periods. Defendant contends that the state failed to show that the cleansing period with respect to his prior offenses has not elapsed.
*804 Generally, the State has the burden of proving that the cleansing period has not expired; however, where less than the time limitation set forth in La.R.S. 15:529.1(1)(C) has elapsed between convictions or completion of sentence on the predicate offense, it is not necessary for the State to prove defendant's discharge dates. State v. Langlois, 96-0084 p. 14 (La.App. 4 Cir. 5/21/97), 695 So.2d 540, 548, writ granted in part on other grounds and remanded, 97-1491 (La.11/14/97), 703 So.2d 1281. This assignment of error is without merit.
We find no basis in this record to support defendant's pro se contention that his adjudication as a multiple offender offends state and federal prohibition of double jeopardy. State v. Picot, 98-2194 (La. App. 4 Cir. 11/10/98), 724 So.2d 236, 237-38.
THIRD SUPPLEMENTAL ASSIGNMENT OF ERROR: Defendant was denied effective assistance of counsel throughout the entire course of the proceedings.
We find nothing in the record to support this contention. Defendant will have the opportunity to invoke an evidentiary hearing on this issue through an application for post-conviction relief. State v. Prudholm, 446 So.2d 729 (La.1984). This assignment of error is without merit.

CONCLUSION AND DECREE
For the foregoing reasons, the convictions on all three counts and sentence on count one of defendant, Michael Nicholas, are affirmed; the sentences on counts two and three are vacated and the case is remanded for resentencing on those two counts.
CONVICTIONS AND SENTENCE ON COUNT 1 AFFIRMED; SENTENCES ON COUNTS 2 AND 3 VACATED AND CASE REMANDED FOR RESENTENCING AS TO COUNTS 2 AND 3.
NOTES
[1] Defendant in his pro se brief asserts Boykin objections to the guilty pleas; however, the record does not contain transcripts of the relevant arraignments. This issue will be addressed more suitably by application for postconviction relief.