785 So.2d 939 (2001)
STATE of Louisiana
v.
Taurean DUPLESSIS.
No. 2000-KA-2122.
Court of Appeal of Louisiana, Fourth Circuit.
March 28, 2001.
*941 Harry F. Connick, District Attorney, Leslie P. Tullier, Assistant District Atorney, New Orleans, Counsel for State of Louisiana.
Gary W. Bizal, Pierce & Bizal, New Orleans, Counsel for Taurean Duplessis.
Court composed of Judge CHARLES R. JONES, Judge PATRICIA RIVET MURRAY, and Judge DENNIS R. BAGNERIS, Sr.
CHARLES R. JONES, Judge.
Taurean Duplessis appeals his conviction and sentence for the attempted manslaughter of Leroy Butler. We affirm.

PROCEDURAL HISTORY
Duplessis was charged by bill of information with the attempted second-degree murder of Butler, a violation of La. R.S. 14:(27) 30.1. He was convicted by a twelve-person jury of the responsive verdict of attempted manslaughter. He was sentenced to serve ten years at hard labor with credit for time served. His sentence was suspended and he was placed on ten years active probation with conditions including that he report to the Orleans Parish Prison every weekend. This timely appeal follows.

FACTS
At trial, Officers Alvin Poole and Alvin Theard each testified that they responded to a call of an aggravated battery by shooting. When they arrived at the scene, they observed a young man lying face down on the front of the residence. It appeared that the victim had sustained a gunshot wound to his back. A person was standing over the victim applying pressure to the wound. On the ground next to the victim was a spent bullet casing. The front door of the residence was open. Officer Poole observed blood on the front porch. The victim was still conscious and aware of his surroundings. When the victim was questioned by Officer Poole as to what happened, the victim stated that his neighbor, Taurean, shot him. The person standing over the victim identified the shooter, Taurean, as his nephew. Officer Poole testified that it appeared that the victim was shot in the side and that the bullet exited from his back. Officer Poole further testified that he did not enter the house at any time. He stated that he was told that the shooting was over a dispute about a pair of tennis shoes. Officer Poole testified that the crime lab technicians took photographs both outside and inside the residence.
On cross-examination, Officer Poole testified that it appeared that the victim was shot in the left side but that he was not sure. He further testified that he did not search the house for weapons or anything else. He testified that Officer Theard and Detective Davis went into the residence. He was unable to testify if Officer Theard and Detective Davis searched for weapons. The bullet casing found near the victim was found in the grass near the driveway.
*942 On re-direct examination Officer Poole testified that he did not search the house. He testified that he observed the spent bullet casing on the ground near the victim but he was not the person who retrieved the casing.
Officer Theard testified that he and Detective Fred Bates went into the residence to search for a perpetrator and a possible weapon. He testified that he observed drops of blood at the entrance to the victim's home and blood just inside the front door to the victim's home. A baseball cap was located inside the victim's home. A sock was located beneath the rear kitchen window. The burglar bar frame was damaged where the bullet exited the victim and struck the bar. Small bullet fragments were found beneath the burglar bars. Outside of the residence below the kitchen window another sock was found lying on the ground. The kitchen windowpane was damaged and the screen was damaged. On the front lawn, near the victim, Officer Theard observed a spent bullet casing that appeared to come from some type of assault rifle.
On cross-examination, Officer Theard testified that he and Detective Bates went into the residence and that Officer Poole did not enter the residence. He testified that the reason for entering the residence was to look for the perpetrator and weapons. They looked for whatever could be seen in "plain view", however, no perpetrator or weapons were found in the house. The only other person at the scene when he arrived, other than the victim, was the victim's uncle.
On re-direct examination, Officer Theard testified that he was the lead investigator until Detective Bates arrived on the scene.
Detective Bates testified that he investigated the shooting of Butler. He confirmed when he arrived at that scene, Officers Theard and Poole were present, and that the EMS had not yet arrived. He testified that he and Officer Theard searched the house and the entire block for the perpetrator. He had obtained information during the course of the initial investigation that the shooter ran from the victim's home and went around the corner in an eastbound direction. No arrest was made on the day of the shooting. Detective Bates testified that he obtained an arrest warrant for Taurean Duplessis. Several days after the shooting, Duplessis turned himself in at the Seventh District Police Station and was arrested.
Detective Bates further confirmed that several blood splatters were seen on the front porch. Directly inside the front door of the residence was a smearing of blood. An indentation in the metal frame around the front door was also visible. Inside the living room was a black Raiders skullcap type hat and a bandana. A black sock was observed on the floor inside below the rear kitchen window. The window was broken and the screen was damaged. Another black sock was lying on the ground below the rear kitchen window. He also observed that the light bulbs in the fixtures around the rear of the house had been unscrewed. He was unable to determine why the bulbs were unscrewed. He received information that the hole in the kitchen window screen was not there prior to the shooting. He stated that the bullet casing found at the scene was a large type belonging to an assault type SKS or AK 47-type rifle. No weapon was recovered from the scene. At the time of the search no one was inside the residence.
On cross-examination, Detective Bates testified that he did not perform any trace powder examination of the victim's hands to determine if he had fired a weapon. He stated that in addition to Officer Theard, Detective Adams also searched various rooms of the residence with him. He also *943 testified that the rear door of the house was locked with a deadbolt only allowing someone to enter if they had a key.
On re-direct examination, Detective Bates testified that no blood was found anywhere in the house except near the front door.
Leroy Butler, the victim, testified that he was sixteen years old and lived next door to Duplessis. He testified that he and Duplessis knew each other well and often played basketball and football together. He testified that he was the victim of the shooting in this instance, and that he was at home alone at the time of the shooting. He testified that prior to the shooting an incident occurred between himself and Duplessis over a pair of tennis shoes in late January. Butler stated that he owned an orange, grey and black pair of Nike Max tennis shoes which Duplessis wanted to purchase for seventy dollars. Duplessis asked for the shoes to wear and told Butler that he would pay him the following day. When Duplessis did not pay for the shoes the next day, Butler challenged him to a fight outside Duplessis' house. Everybody in the neighborhood was outside watching the fight. Duplessis went inside of his house and returned with a knife. Duplessis' grandmother tried to break up the fight and someone took the knife from Duplessis. His grandmother then told Duplessis "...to leave it alone and go inside." Butler testified that when he went to retrieve his tennis shoes from Duplessis later that day, the shoes were cut-up and placed in a bag of bleach. He testified that Charles Jones eventually gave him the shoes and that Duplessis owed him the money. He never received the money from Duplessis.
After this incident another incident occurred when Butler was going home from school. He saw Duplessis, Charles Jones and another boy coming from the bus stop. Butler asked Duplessis for the money. When Duplessis answered "No", Butler challenged him to a fight. Duplessis picked up a pipe and began to chase Butler who was riding a bike. Butler rode home. When he came back outside he saw Duplessis coming down the street with the pipe in his hand. Butler, who was still on his bike, rode the bike into Duplessis' backyard, got off of the bike and asked Duplessis, "Say, bro, what you want to do". Duplessis threw the pipe at Butler, ran onto his porch, and told Butler, "I'm going to kill you". This incident happened at the beginning of February prior to the shooting.
Butler further testified that on the day of the shooting, he saw Duplessis riding his bike up the street. No words were exchanged, and no fight ensued. Butler testified that he did not own a gun and did not have a friend who owned a gun. He testified that no one ever loaned or gave him a gun. He denied pulling a gun on Duplessis on the day of the shooting. He testified that on the day of the shooting he was in his bedroom talking on the telephone when Charles Jones knocked on his window. He then went to the front door and upon opening the door, Duplessis shot him. He testified that he backed up slightly and walked out of the door and down the steps. He was bleeding and holding his back. He saw Duplessis and his uncle. The uncle asked him what happened. He told him that Taurean shot him. As he was lying on the ground he saw Duplessis run into his (Butler's) house. He did not observe Charles Jones after he was shot. He described Duplessis as wearing a black and white bandana with a Raider's knit cap. He was not wearing a shirt. He had on shorts and black tennis shoes. He did not see the color of his socks. He testified that Duplessis was wearing the bandana around his mouth. *944 He testified that the black socks found at the scene did not belong to him. He testified that he was one hundred percent sure that Taurean Duplessis shot him and that he never pulled a gun on Taurean.
On cross-examination, Butler testified that as soon as he opened the front screen door Duplessis was to his right and he was shot. He testified that he was upset that Duplessis owed him money. He testified that he had confronted Duplessis only twice prior to the shooting. He admitted that Duplessis' grandmother gave him the money for the tennis shoes. He testified that was probably why Taurean was angry and shot him. He denied knowing anyone named Jason Williams. He denied chasing Duplessis into his house on the day that Duplessis pulled a knife on him. He admitted that he had possession of Duplessis' bike for about thirty minutes on one occasion after telling Duplessis that he should let him have the bike until he paid him the money. He denied using force or threats to obtain the bike. He testified that Duplessis voluntarily gave him the bike but that Duplessis was angry because he did not want to pay him the money. Butler testified that Duplessis pulled a knife on him that day because he was angry about the bike.
On re-direct examination, Butler testified that the Duplessis' grandmother gave him a one hundred-dollar bill. He made change and gave her back fifty dollars. He testified Duplessis was present and was "fussing" at his grandmother telling her not to give him the money.
Dr. Angela Hendry testified that she was a third year general surgery resident at the LSU Medical Center on the day she treated Leroy Butler. She testified that the victim sustained a large hole near his mid back. Surgery was performed. Fortunately no vital organs were damaged and the spinal cord was not damaged.
On cross-examination Dr. Hendry testified that she could not tell which of the two wounds was an entrance wound. She testified, however, that both were towards right rear of his back. One was located more on the right lateral side while the larger one was more towards the middle of his back near the spine. Dr. Hendry testified that she could not determine the trajectory of the bullet.
Colette Haynes testified for the State. She testified that she is the mother of the victim, Leroy Butler and identified a photograph she took of his wounds.
Jason Williams was called to testify for the defense. He testified that he knew both Duplessis and Butler as acquaintances. He knew Duplessis for about one year and Butler for about three months. The witness described an incident that occurred between Duplessis and the victim. He testified that one Thursday evening (he could not remember the date) he was walking to visit a friend when he came upon Duplessis and the victim near the corner of Grant and Laine Streets. He testified that it appeared that Duplessis did not want to fight but Butler started towards Duplessis and pushed him. Williams testified that Duplessis won the fight and Butler went into his house and came out with a gun and pointed it at Duplessis. Williams testified that when he saw the gun he ran back home. He heard two gunshots. He testified that was all the information he had of his own knowledge. He testified that it took him about thirty to forty-five seconds to reach his house. He testified that Butler has a reputation of being a bully. He testified that after this incident he spoke to Duplessis who called him from jail. They talked about what was going on in the outside world. He admitted that they spoke about what happened the night of the shooting.
*945 On cross-examination, Williams testified that the fight only lasted three or four seconds but that it took him thirty seconds to run back home. He testified it took Butler about two seconds to go into his house and come out with a gun. He admitted that he and Duplessis remained outside but denied that he ran because Duplessis had a gun. He denied that Butler had ever bullied him or done anything to him. He testified that he knew of Butler's reputation from other people and did not hang around Butler. He testified that he did speak to defense counsel who asked him to run the same route home again in order to measure the time it took on the night of the incident. He denied that counsel told him what to say during his testimony. He admitted that he did not want to testify because he did not want to get involved. He testified that he was scared that someone would harm him. He told his mother some of what he saw but did not tell her the whole story because he did not want her to know.
Taurean Duplessis testified on his own behalf. He testified that he had known Butler for about four or five years. He testified that the shooting took place on February 11, 1999, about three weeks after he began to have problems with Butler. He testified that Butler started to "bully me around and stuff". He testified that Butler wanted to loan him some tennis shoes because he wanted to borrow twenty dollars. He testified that he told Butler that he did not want the shoes. Then Butler wanted him to buy the shoes. He told Butler that he did not want to buy the shoes but Butler kept asking him so he finally agreed to take the tennis shoes. He testified that he was holding the shoes until he got his money back. At this point, the testimony of Duplessis becomes confusing at best. He testified, "He told me he was going to give me my money back. I told him I didn't really want the money, you know, just, you know, I don't want the tennis. I told him I would hold the tennis anyway." Duplessis continued to testify that Butler told him that he would pay him back on Sunday. This conversation took place on the Thursday of the previous week. He testified that later on that night Butler wanted him to buy the tennis shoes but he did not want to buy them. Butler then wanted to fight, and he told Butler that he did not want to fight. However, Butler kept pushing for a fight. Butler ran at him and tried to hit him. Duplessis testified that he ran inside of his house and grabbed a knife and ran back onto his porch and told Butler "Leave me alone. I didn't want to fight." Butler began to laugh and tell him that he was not going to come off of the porch. It was then that Duplessis' grandmother came outside and told Duplessis to leave it alone and go inside the house. He denied that he intended to stab the victim and that he only wanted him to leave him alone and stop bothering him.
Duplessis testified to several incidents in which Butler harassed him, bullied him, threatened him with a gun, and during this period of time took and kept his bicycle.
On the day of the shooting, Duplessis and Jason Williams were standing on the corner near Duplessis' home. Jason asked him to accompany him to a friend's house. He told Jason he would go to a party at Kim's house. As they walked around the corner they passed Butler's house. Duplessis testified that he was wearing a Raider's cap and a bandana around his neck and also wearing a black shirt and shorts and black tennis shoes. When Butler saw Duplessis, Butler came outside and wanted to fight. A short scuffle ensued and Butler ran inside of his house. Butler returned outside with a gun and Duplessis testified that he and Jason ran away. Duplessis then retrieved the gun from under *946 his grandmother's house and stated that he was going to hide the gun in the woods down the street so that Butler could not harm him as he was walking back from the party later that night. He testified that as he walked past Butler's front gate, Butler came outside, pulled a gun and fired it twice. Duplessis Testified that it was at this time that he fired the gun to scare the victim. He stated that he did not mean to shoot him. Butler stumbled back and to the left and doubled over holding his stomach. Duplessis testified that he wanted to see if Butler was shot but he was afraid that he would be shot. He testified that he panicked and ran to the back of the victim's house and was trying to get out of the back door. He put the gun through the back window and walked back out of the front of the house where he saw his uncle. Duplessis testified that he fired the gun because he was afraid for his life. He testified that he was standing near the driveway area where the empty bullet casing was found.
On cross-examination Duplessis testified that he was with Jason Williams on the night of the shooting. He testified that when Jason saw the victim with a gun he ran away and did not see the shooting. Duplessis testified that he also ran away but returned to Butler's house to show him the gun so that he would leave him alone. He testified that he did cut up the tennis shoes and put them into a bag of bleach because Butler would not pay him back and was always trying to fight with him. He testified that his grandmother gave him back the twenty dollars when she paid Butler for the tennis shoes. He testified that he was scared of the victim who bullied him but still cut up and bleached his tennis shoes. He testified that he was told by Rocky, the man who gave Duplessis the gun, to just shoot into the ground to scare Butler. Duplessis panicked and shot him. He admitted aiming at Butler but said he did not want to shoot him. He testified that, "I was, you know, just messing".

ERRORS PATENT
A review of the record for errors patent reveals two errors in Duplessis' sentence. He was convicted of attempted manslaughter and sentenced to ten years at hard labor with credit for time served. His sentence was suspended and he was placed on ten years active probation with the condition that he report to the Orleans Parish Prison every weekend. Pursuant to La. C. Cr. P. art. 893(A), the maximum term of probation is five years. Furthermore, a person convicted of a crime of violence as defined in La.R.S. 14:2 is not eligible for a suspended sentence. Attempt manslaughter is defined as a crime of violence. La.R.S. 14: 2(13)(d). While the trial court illegally sentenced him to ten years probation, by receiving a suspended sentence, he has not received the mandatory jail time at hard labor. Therefore, the sentence is an error favorable to Duplessis as to the suspended sentence, but the ten years probation is excessive. Thus, we amend Duplessis' probationary period under his sentence to five years. The other sentencing errors will not be corrected on appeal absent a request for review by the state. State v. Fraser, 484 So.2d 122 (La.1986).

DISCUSSION
By his sole assignment of error Duplessis complains that he was denied his right to compulsory process because no subpoenas were served or returns made for Jason Williams and Patrick Davis. He argues that the testimony of these witnesses was crucial to his defense strategy of self-defense. On the day of trial, he orally moved for a continuance but the *947 trial court denied the motion.[1] The trial court found that Duplessis was not diligent in securing the witnesses for trial. Jason Williams was finally located and did testify at the trial. Patrick Davis was not located. Duplessis asserts that both witnesses were to testify to facts that would corroborate self-defense and that Butler had been threatening Duplessis prior to the shooting. He argues that the absence of Patrick Davis's testimony compromised his defense strategy which entitles him to a new trial.
The right of a defendant to compulsory process is the right to demand subpoenas for witnesses and the right to have those subpoenas served. This right is embodied in both the federal and state constitutions and in this state's statutory law. State v. Lee, 446 So.2d 334 (La.App. 4th Cir.1984); United States Constitution, Amendment 6; La. Const. Art. I, sec. 16 (1974); La.C.Cr.P. art. 731.
However, in State v. Nicholas, 97-1991 (La.App. 4 Cir. 4/28/99), 735 So.2d 790, this Court stated that this right does not exist in a vacuum, and a defendant's inability to obtain service of requested subpoenas will not be grounds for reversal of his conviction or new trial in each and every case. In order for a defendant to show prejudicial error, he must demonstrate that the testimony of the absent witness would be favorable to the defense and would indicate the possibility of a different result if the witness were to testify. See also, State v. Green, 448 So.2d 782 (La.App. 2 Cir.1984).
Prejudicial error arises where the absent witness is "vital" to the defense. State v. Peterson, 619 So.2d 786, 790 (La. App. 4 Cir.1993). In State v. Hill, 534 So.2d 1296, 1298 (La.App. 4th Cir.1988), writ denied, 536 So.2d 1248 (La.1989), this Court found such prejudicial error to have occurred where all evidence presented to the jury boiled down to a head-to-head confrontation between defendant and a police officer. There, the Court found that had the unsubpoenaed witness testified in support of defendant's case the result might have been different.
In the instant case, Duplessis orally requested a continuance in order that the witnesses he sought might be subpoenaed. This Court addressed a similar contention in Nicholas and in State v. Borne, 96-1130 p. 7-8 (La.App. 4 Cir. 3/19/97), 691 So.2d 1281, 1284-85, writ denied, 97-1021 (La.10/3/97), 701 So.2d 197, certiorari denied, 523 U.S. 1009, 118 S.Ct. 1196, 140 L.Ed.2d 325 (1998). In Borne, the court reasoned that La.C.Cr.P. art. 707 requires that a defendant file a written motion for continuance at least seven days prior to trial, specifically alleging the grounds on which it is based and verified by the affidavit of the defendant or his counsel. Upon written motion and after a contradictory hearing, the court may grant a continuance, but only on a showing that such motion is in the interest of justice. Where the motion for continuance is based upon the absence of a witness, La.C.Cr.P. art. 709 requires a statement of the facts to which the absent witness is expected to testify, showing the materiality of the testimony and necessity of the witness's presence; facts and circumstances showing a probability that the witness will be available at the time to which the trial is deferred; and facts showing due diligence used in an effort to procure attendance of the witness. The granting or denying of the motion to continue lies within the trial court's discretion. La.C.Cr .P. art. 712. Denial of the motion is grounds for reversal only where defendant shows both abuse *948 of the trial court's discretion and specific prejudice. State v. Borne, supra at p. 7, 691 So.2d at 1284. In Borne, defendant's oral motion to continue was based on his allegation that the clerk of court had failed to process his request to subpoena twenty-five witnesses. Other fact witnesses and the police officers testified at the trial. This Court found defendant had not met his burden under La.C.Cr.P. art. 709.
In the instant case, Duplessis' counsel testified at the pre-trial hearing that the defense subpoenas did not go out for Williams and Davis. Counsel orally moved for a continuance. Counsel admitted that he found out over the prior weekend that the witnesses had not been subpoenaed and that they would not voluntarily testify because they were afraid of retaliation by the victim. The trial court denied the oral motion for a continuance and instructed defense counsel to complete all the necessary information for instanter subpoenas for that day. Counsel continued to argue that he should be granted a continuance. The trial court told counsel that he had a duty to check several days in advance of the trial to make sure that his witnesses were subpoenaed. By bringing a subpoena problem to the court's attention prior to the day of trial, instanter subpoenas could be issued or an explanation given as to why the witnesses were not or could not be served. During the colloquy, defense counsel repeatedly stated that Jason Williams was crucial to the defendant's defense. The issue as to Jason Williams is moot because he was located and did testify at trial. Therefore, Duplessis did not sustain prejudice. Counsel stated that Patrick Davis would testify that Butler had chased Duplessis one-week before the shooting. The testimony at trial clearly placed before the jury the fact that the victim had a reputation as a bully and that he and the defendant were engaged in a controversy which often resulted in violent behavior. Duplessis testified that he was chased several times by the victim who pointed a gun at him. Williams also testified that the victim pointed a gun at the defendant the night of the shooting. Therefore, Patrick Davis's testimony would have been cumulative. Duplessis has not shown that the absence of Davis's testimony prejudiced him and would have resulted in his acquittal. Apparently, the jury did not totally believe Butler's account of the shooting because the jury ultimately found Duplessis guilty of the lesser-included offense of attempted manslaughter. This assignment of error is without merit.

DECREE
Because there was no abuse of the trial court's discretion in denying Duplessis' motion for a continuance based on the unavailability of witnesses, Taurean Duplessis' conviction is affirmed. His sentence is amended to five years supervised probation, and as amended is affirmed.
AMENDED AND AFFIRMED AS AMENDED
NOTES
[1] This oral motion was later supplemented with a written motion for continuance.